**UNITED STATES v. ELIASSON.**

Circuit Court of Appeals, Ninth Circuit.

July 18, 1927.

No. 5054.

1. **Army and navy** ☞51½—**In action on war risk insurance policy, instruction as to presumption that plaintiff contracted sleeping sickness while in service held proper under statute (World War Veterans' Act 1924, § 200, as amended by Act July 2, 1926, § 7 [44 Stat. 793]).**

In action on war risk insurance policy, where proof showed that plaintiff had sleeping sickness before January, 1923, instruction that, if jury found that he was suffering from such disease, it must presume that he contracted it while in the service of the United States, but that such presumption might be rebutted by clear and convincing evidence, *held* proper, in view of World War Veterans' Act 1924, § 200, as amended by Act July 2, 1926, § 7 (44 Stat. 793).

2. **Army and navy** ☞51½—**In action on war risk insurance policy, instruction as to when disability was total and permanent held proper; "total disability;" "permanent disability."**

In action on war risk insurance policy, instruction that "total disability" was any impairment of mind or body rendering it impossible for insured to follow continuously a substantially gainful occupation without seriously impairing his health, and that disability was permanent when of such nature as to render it reasonably certain to continue throughout the lifetime of insured, *held* not improper.

[Ed. Note.—For other definitions, see Words and Phrases, First Series, Permanent Disability; First and Second Series, Total Disability.]

3. **Army and navy** ☞51½—**"Total" and "permanent," as applied to disability, do not imply incapacity to do any work at all.**

The words "total" and "permanent," as applied to a disability as defined by War Risk Bureau, do not necessarily imply an incapacity to do any work at all.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Permanency—Permanent; Total.]

4. **Army and navy** ☞51½—**Evidence held to sustain verdict for plaintiff in action on war risk insurance policy.**

In action on war risk insurance policy, evidence of ailments and illnesses contracted while in service and continuing thereafter *held* sufficient to sustain verdict for plaintiff.

**5. Army and navy ⬤⇒51½—War risk insurance policy should be liberally construed.**

War risk insurance policy should be liberally construed in favor of insured.

In Error to the District Court of the United States for the District of Montana; Charles N. Pray, Judge.

Action by Per Eliasson against the United States. Judgment for plaintiff, and the United States brings error. Affirmed.

Wellington D. Rankin, U. S. Atty., and L. V. Ketter, Asst. U. S. Atty., both of Helena, Mont. (William Wolff Smith, Gen. Counsel, and James T. Brady, L. A. Lawlor, and C. L. Dawson, Attys. U. S. Veterans' Bureau, all of Washington, D. C., of counsel), for the United States.

J. Molumby and Frank Polutnik, Jr., both of Great Falls, Mont., for defendant in error.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

GILBERT, Circuit Judge. On his contract of war risk insurance, issued under the War Risk Insurance Act and acts supplemental thereto (Comp. St. § 514a et seq.), the defendant in error recovered a judgment against the United States for $4,715. In his complaint he alleged that on May 6, 1918, while in the military service of the United States, he obtained war risk insurance for $10,000, payable in monthly installments of $57.50, in the event of his death or permanent disability occurring while the insurance was kept in force by payment of the monthly premiums due thereon, which monthly payments were paid until his discharge from military service on December 7, 1918; that he became permanently and totally disabled at the time of his discharge as the result of stomach trouble, encephalitis lethargica (sleeping sickness), and broken arches. The defendant admitted that the insurance was in force and effect from May 16, 1918, to July 31, 1919.

The defendant assigns error to the denial of its motion for an instructed verdict in its favor on the ground that, not only was there no proof that the plaintiff was permanently and totally disabled at any time prior to July 31, 1919, but that, on the contrary, the proof was that he could not have been so disabled prior to that date. Reliance is placed on the fact that after his discharge the plaintiff engaged in manual labor at different periods as long as a month at a time, as showing conclusively that the disability was not total or permanent at any time prior to January,
1923, when he became ill with sleeping sickness; also upon the fact that Ziller, the supervising officer of trades and industries in the Veterans' Bureau in connection with vocational training, testified that the plaintiff was a pupil under his supervision in an auto school, engaged in fitting pistons and other work on automobiles, with a view to becoming an auto mechanic, and that from October, 1920, to March, 1922, he saw the plaintiff at least once a month, and sometimes every week, that he received from the plaintiff's instructor only favorable reports upon his work, that the plaintiff was not absent from his class a month in the aggregate, that he noticed nothing in his physical condition which would disable him from continuing his attendance in the school, that he was in fit general physical condition to work as auto mechanic upon his course, and that the reason why he was granted vocational training was that he had flat feet; but upon cross-examination Ziller testified that the plaintiff was transferred to battery work for the reason that he was found in such physical condition that he could not be an auto mechanic. "He complained to me of his legs."

Among other witnesses relied upon is one Nelson, who testified that the plaintiff worked for him at heavy manual farm labor and received the going wage, although at times he was disabled on account of flat feet and rheumatism. There was evidence for the plaintiff, however, that a few days after April 27, 1918, the date of the plaintiff's enlistment, he contracted a cold from exposure and was ill for three or four days, and five or six weeks later was again ill with stomach trouble, with cramps and vomiting; that later he went to the base hospital for examination and was found unfit for overseas duty; that thereafter, in addition to stomach trouble, he suffered from rheumatism during the remainder of his time of service; that after his discharge he worked about a week in Montana, when he was taken ill with influenza, accompanied with severe headaches and stomach cramps and vomiting, leaving him weak; that he worked again for about two or three weeks, and was unable to continue, and was laid up for a period of a month and a half or two months; that he worked for one Dixon for about a month, but suffered with rheumatism and broken arches, and pain in ankles and knees; that he was laid up for a month and a half or two months, till some time in July, 1919; that he worked about a week in North Dakota, but was again taken ill with stomach trouble; that he received electrical treatments for rheumatism; that he

again worked for two or three weeks, and worked off and on till February, 1920, when he put in a claim for compensation with the government and was ordered to St. Paul for examination. Returning, he stopped at Fargo, and his condition then, as described by a witness, was that he was hardly able to walk, that his feet were sore, that he suffered from rheumatism, that his ankles and knees ached and his eyes troubled him, and that he was thin and emaciated.

There was evidence that he again attempted to work at different places at different occupations, but that his health became no better until about the middle of January, 1923, when he became very ill and was taken to a hospital. Dr. Worstell testified that on January 20, 1923, he treated the plaintiff for an acute attack of encephalitis lethargica; that in his judgment the sickness started about two days before he was called in; that in his opinion the plaintiff's sleeping sickness may have developed from some attack of influenza, pneumonia, or some attack of cold in some part of the head; and that the time in which sleeping sickness develops is relatively short. He admitted that he could not say whether or not the plaintiff's sleeping sickness was caused by some condition or sickness that was incurred in 1918, but he expressed the opinion that it was more probable that it occurred from a cause which came into existence some time in 1922, adding, however, "I cannot fix the time."

[1] Section 200 of title 2 of the World War Veterans' Act of 1924, as amended by Act July 2, 1926, § 7 (44 Stat. 793), provides that an ex-service man who is shown to have had prior to January, 1925, encephalitis lethargica, shall be presumed to have acquired his disability in such service between April 6, 1917, and July 2, 1921, or to have suffered an aggravation of said disease between said dates, but that said presumption shall be rebuttable "by clear and convincing evidence." We have seen that the plaintiff was suffering from that disease in January, 1923. The presumption that he acquired it within the prescribed dates may be rebutted only by clear and convincing evidence.

There is no positive evidence here to rebut the presumption. All that can be claimed is an absence of proof that the plaintiff acquired the disease before January, 1923. According to Dr. Worstell's testimony the disease might possibly have been acquired prior to July 31, 1919, through germs that were lodged from some attack of influenza or cold in the head and developed later. The doctor thought that the probabilities were against any such assumption, but probability, it is believed, may not be relied upon as a substitute for the clear and convincing proof required by the statute. Accordingly we find no error in the instruction to the jury that, if they found from the evidence that the plaintiff was suffering from encephalitis lethargica, they must presume that he contracted it while in the service of the United States, but said the court: "Said presumption may be rebutted by clear and convincing evidence."

[2] The jury were also instructed that a total disability was any "impairment of mind or body which renders it impossible for the insured to follow continuously a substantially gainful occupation without seriously impairing his health," and that said total disability was to be considered by them as permanent "when it is of such nature as to render it reasonably certain that it will continue throughout the lifetime of the insured," and the court submitted to the jury the question whether or not the plaintiff became totally and permanently disabled at a time prior to July 31, 1919, and instructed them that the inability to do hard manual labor is not a test of total and permanent disability, within the meaning of that term as used in the war risk insurance contract, but that flat feet would not constitute a total and permanent disability, and that, to recover, the plaintiff must prove that he had prior to July 31, 1919, a continuous disability which totally disabled him from earning a continuous and substantially gainful wage from any kind of work. No exception was taken to those instructions, which, as we construe them, permitted the jury to find upon the evidence a total permanent disability irrespective of the proof of encephalitis lethargica.

[3-5] We are not convinced that it was error so to instruct. The words "total" and "permanent," as applied to disability, as defined by the War Risk Bureau, do not necessarily imply an incapacity to do any work at all. We find in the record ample evidence to go to the jury to show that, at the time when the action was begun and at the time of the trial, the plaintiff's disability was total and permanent, and that the evidence was such that the jury might properly have found that there was failure to rebut the presumption that the plaintiff's encephalitis lethargica was contracted prior to July 2, 1921, and that, aside from that disease and its effects, the evidence of the plaintiff's ailments and illnesses, contracted while in the service and continuing thereafter, was in itself sufficient to sustain the verdict, for it tended to show

that the plaintiff had no substantial earning capacity; that the work which he did was intermittent and was continued only for brief periods, and invariably resulted in relapses which totally unfitted him for work. The insurance contract should be liberally construed. Jagodnigg v. United States (D. C.) 295 F. 916; Starnes v. United States (D. C.) 13 F.(2d) 212.

The judgment is affirmed.

DIETRICH, Circuit Judge (concurring). Assuming, in harmony with the contention of defendant in error, but not deciding, the applicability of the statutory presumption respecting the service connection of sleeping sickness, I am unable to perceive its probative efficacy in a case like this. The question being, did plaintiff become "totally and permanently disabled" prior to August 1, 1919, our concern is with the effects rather than with the germinal origin of any disease with which he may have been afflicted. It would therefore seem to be immaterial that he acquired the germ during the term of the insurance where, as here, it conclusively appears that if so acquired it did not operate seriously to impair his physical or mental capacity until three years after the insurance expired. But if we assume that the instruction upon the point might properly have been withheld, I am unable to see how the giving of it could have been prejudicial. The court clearly advised the jury that only in case they were convinced by the evidence of plaintiff's total and permanent disability during the insurance term would they be warranted in finding for him; and this view was emphasized by repetition. Attention was thus effectively drawn to the controlling issue of plaintiff's actual physical condition at the time the insurance terminated, and upon that issue I agree that under the accepted definitions of "total" and "permanent" disability as set forth in the instructions, the case was one for the jury."