## ELBAG v. UNITED STATES.

### No. 3778.

District Court, D. Massachusetts.

Feb. 27, 1931.

Paul L. Keenan, of Boston, Mass., for plaintiff.

Frederick H. Tarr, U. S. Atty., John Laurence Hurley, Sp. Asst. U. S. Atty., and William J. Hession, Regional Atty., U. S. Veterans' Bureau, all of Boston, Mass., for the United States.

BREWSTER, District Judge.

This is a petition to recover upon certificates of war risk insurance. The veteran enlisted May 7, 1917, and thereafter obtained certificates of war risk insurance aggregating $10,000, which lapsed for nonpayment of premium on December 31, 1918. He subsequently converted and reinstated the policies for smaller amounts, but, inasmuch as he is now seeking to recover on the policies first issued and which expired December 31, 1918, the only question presented is whether, on or before that date, he had become totally and permanently disabled within the meaning of the contract.

Elbey enlisted in the United States Marine Corps and was sent overseas. After he had been in France nearly a year, he suffered a complete mental collapse. He was deluded and hallucinated and at times was so violent that he had to be kept in close confinement. This condition continued until after his return to this country. He was first hospitalized in this country in the Naval Hospital in West Virginia, and then at St. Elizabeth's Hospital in Washington. He was in this latter hospital from May, 1918, to March, 1919, and during that period he showed marked symptoms of mental disorder. His case was diagnosed as dementia praecox. When his condition had sufficiently improved, he was discharged and sent to his home in Worcester, Mass. He has no memory of the psychotic periods in France, and only a hazy recollection of his hospitalization at St. Elizabeth's. He gave a history of what the doctors expressed as schizophrenia—a splitting of the mind, during and after his military service in France. After his return to his home, he did little or no work, nothing more than odd jobs now and then which were

not remunerative. He became nervous and restless and finally left, joining a carnival troup which landed him in Georgia, where he enlisted in the United States Army. He concealed at that time any suggestion of illness and, fearing that his misrepresentations might be discovered, he volunteered for service in Siberia, and from there he was transferred to the Philippines. He was frequently in the hospital while in the Philippines. His army record shows that, while serving there, he was unreliable, unfaithful to his duties, with little sense of responsibility. He was discharged from the army in August, 1920, and again sent home. In 1921 he seems to have come under the supervision of the Veterans' Bureau and was examined by specialists in mental diseases in 1921, 1922, and 1923. At the time of these examinations, no evidence of active psychosis was found. In February, 1924, he was sent to the United States Veterans' Hospital No. 44 at West Roxbury. He remained at the hospital until October, 1924, when he was given a leave of absence for one month. He did not return to the hospital, but again yielded to his wanderlust, and this time sought new experiences on the seas. He signed up for a voyage to New Orleans, was there discharged, and then signed again, sometimes as cook and sometimes as seaman, for voyages across the ocean. At the end of each voyage he was refused re-employment, and in February, 1925, he was picked up in a destitute condition by the Red Cross in Georgia and turned over to the United States Veterans' Hospital No. 62. From this hospital he was transferred to the United States Veterans' Hospital No. 95 at Northampton, Mass., where he remained until June, 1925, when he was given a three months' parole in the care of his family. Again he left home suddenly, joined a circus, tried the vaudeville stage and other employment, but none of his efforts met with success. He also tried to earn a little money by canvasing, but he soon lost this job on account of his inefficiency. His conduct was at all times erratic and every attempt to earn a living met with failure. On more than one occasion he had been obliged to apply to the Red Cross for funds with which to get back to his home and relatives.

At the West Roxbury hospital, his disorder was diagnosed as dementia praecox, simple type, and at Northampton it was diagnosed as manic depressive psychosis. It is significant that at neither of these hospitals was he discharged as a patient completely recovered, but was only given temporary leave of absence.

It is quite apparent that this veteran was constitutionally unstable with a form of mentality which medical experts would define as constitutional psychopathic inferiority, and that this condition existed when he enlisted, and that it was because of this condition that he was unable to withstand without harmful effects the harrowing experiences of the war. One of the marked characteristics of this psychopathic inferiority is, to use the language of one of the witnesses, a "tendency to veer about in one's mode of life * * * to follow emotional trend rather than businesslike occupation." Whether his episodes were symbolic of dementia praecox or of manic depressive psychosis, it is none the less the fact that they aggravated the condition and were a contributing cause to the impairment of his capacity to apply himself with substantial regularity to any useful occupation. There was medical testimony that such an episode as Elbey experienced in France would result in a general breaking up of the personality so that thereafter he would not be able to carry on as he did before.

It is no answer to say that a stronger personality would have withstood the pressure of the war or would have made a better recovery. We have to deal with the case of one who, when insured, was psychopathically inferior, and with effects that were produced upon the particular individual.

This mental condition which has rendered it impossible for Elbey to consistently apply himself to any one task clearly had its origin while he was in the service and before the lapse of the policies. It is equally clear that since his return he has not at any time been able to carry on with substantial regularity any gainful occupation. While it is true that he was able to embark upon numerous adventures, he did not evince the ability to hold any job in the ordinary competition of life. This is the test. Knight v. United States (D. C.) 45 F.(2d) 202; United States v. Cox (C. C. A.) 24 F.(2d) 944.

There can be little doubt, on the evidence, that this disability was due to an impairment of mind, induced or aggravated by the mental abberations which occurred while the veteran was in the service and from the effects of which he has never recovered.

I have been asked to rule that, inasmuch as the veteran enlisted a second time, in 1919, he thereby is to be conclusively presumed to have been sound in body and mind at the time of the enlistment, citing the case of Caprio v. United States (C. C. A.) 45 F.(2d)

520. In that case, which arose in this circuit, reference is made to section 200 of the World War Veterans' Act of 1924 (43 Stat. 615), as amended by the Act of July 2, 1926, § 7 (44 Stat. 793). This act, as amended in 1926, required a conclusive presumption that "for the purposes of this Act" the veteran was in sound condition when he enlisted. In the earlier act it was for the purposes of the section dealing with compensation only that such a conclusive presumption could be invoked, and the substitution of the word "Act" for the word "Section" was deemed to be significant in Caprio v. United States, supra, and also in Brandaw v. United States (C. C. A.) 35 F.(2d) 181 and Jackson v. United States (D. C.) 24 F.(2d) 981. But Congress in 1930 (Act of July 3, 1930, c. 849, § 11, 46 Stat. 995 [title 38 U. S. Code, § 471, 38 USCA § 471]) saw fit to further amend section 200 of the World War Veterans' Act by inserting, in lieu of the words "for the purposes of this Act," the words "for the purposes of this section and section 304" (as amended by Act July 3, 1930, § 23 [title 36 U. S. Code, § 515, 38 USCA § 515]), so that, as the law now stands, the presumption can be invoked only for the purposes of section 200 of the act, which relates to compensation, and section 304 of the act, which relates to reinstatement of insurance. The provisions of the statute creating this presumption, therefore, have no application to a case which does not involve compensation or reinstated insurance.

My conclusion, therefore, is that the veteran became totally and permanently disabled on or before December 31, 1918, and that the plaintiff is entitled to recover on the certificates of war risk insurance issued January 1 and February 12, 1918, respectively, and that upon surrender of any subsequent contracts, or policies, he is entitled to a judgment for the amount lawfully due.